UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MICROSOFT CORPORATION and          :
MICROSOFT LICENSING GP,            :
                                   :        14-cv-6039 (JSR)
        Plaintiffs,                :
                                   :        OPINION
        -v-                        :
                                   :
SAMSUNG ELECTRONICS CO., LTD.,     :
                                   :
        Defendant.                 :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

Plaintiffs Microsoft Corporation and Microsoft Licensing GP (together, "Microsoft") bring this action against defendant Samsung Electronics Company, Ltd. ("Samsung") for breach of contract and declaratory judgment. At issue are two related agreements, the Confidential Patent License Agreement ("PLA"), which provides for cross-licensing of both companies' patent portfolios, and the Confidential Business Collaboration Agreement ("BCA"), which provides that Samsung will develop and market devices that use Microsoft software in exchange for credits against royalties it owes under the PLA. Both agreements provide for arbitration of certain types of disputes under the International Chamber of Commerce ("ICC") Rules. On October 10, 2014, Samsung filed a motion to compel arbitration and to stay the case pending the conclusion of the arbitration. Following full briefing and oral argument, the Court, on November 13, 2014, issued a "bottom line" order denying Samsung's motion. This Opinion explains the reasons for that ruling.

The two agreements were executed concurrently on or about September 28, 2011, and have an effective date of July 1, 2011. The PLA provides that each party grants to the other party and its subsidiaries, including subsidiaries and business units acquired after the effective date, a worldwide license to its patent portfolio for use in certain products for a term of seven years. PLA §§ 3.1-3.2. The licensed products include "Android"-based smartphones and tablets, of which Samsung is the world's largest producer, and which Microsoft alleges infringe its patents. See Amended Complaint dated Oct. 3, 2014 ("Amended Compl.") ¶ 7. For Fiscal Year 1, Samsung is to pay Microsoft a predetermined lump sum. PLA § 4.1. For Fiscal Years 2 through 7, Samsung owes Microsoft a royalty based on the number of devices distributed during that fiscal year. Id. § 4.2.2. Samsung, in turn, is entitled to deduct certain license fee credits from the total royalties due as consideration for Microsoft's use of its patents. Id. § 4.2.1.

The PLA further gives Microsoft the right to audit Samsung's books and records on a periodic basis. Id. § 4.2.4. If Samsung "does not agree with the auditor's results or the scope of the audit," then the parties must go through a good faith discussion process. Id. § 4.2.5. If, after that process, "the parties are then still unable to resolve any disputes arising out of an audit per this Section 4," they agree to submit the dispute to binding arbitration under the ICC Rules in Tokyo, Japan. Id. Finally, the parties agree to exclusive jurisdiction and venue in the Southern District of New

York, or, if no federal jurisdiction exists, in New York state court in Manhattan "[w]ith respect to all civil actions or other legal or equitable proceedings directly arising between the Parties or any of their Subsidiaries under this Agreement." Id. § 7.6.

The second agreement, the BCA, provides that, for Fiscal Years 2 through 7, Microsoft will give Samsung credits to be applied against the royalties it owes under the PLA in exchange for Samsung's efforts to develop and market Samsung devices that use Microsoft Windows software and Microsoft search services. The first type of credits are "Collaboration Credits," which Samsung may earn by creating and executing plans for the development and marketing of Windows phones and tablets, and for making Windows search services available on Samsung devices. BCA § 3.1.1 & Exs. B-D. The second type of credits are "Success Credits," which Samsung may earn by increasing the percentage of Windows devices in its total product mix. Id. § 3.1.2 & Ex. E. Samsung is obligated to invest any success credits earned in a given fiscal year in qualified marketing expenses for the following fiscal year. Id. If its marketing expenses are less than the success credits from the previous year, then Samsung must return the balance to Microsoft ("Success Credit Recapture"). Id. Finally, if Microsoft stops offering Windows phone software, then Samsung will be entitled to a fixed credit per phone in lieu of any success credits ("WP Termination Credits"). Id. § 8.3.

The BCA sets forth a consolidated reporting and invoicing process for both the PLA and the BCA. Within sixty days after the end of each fiscal year, Samsung is to submit a "Royalty and Credit Calculation Report" detailing the number of smartphones and tablets distributed during that year, Samsung's qualified marketing expenses, and Samsung's calculation of any Success Credits, Success Credit Recapture, or WP Termination Credits. Id. § 3.1.4. As under the PLA, Microsoft has the right to audit Samsung's books and records. Id. § 3.1.5. After receiving the Royalty and Credit Calculation Report, Microsoft prepares a single "Annual Invoice" calculating royalties due and credits earned under both agreements and determining the net amount owed by Samsung. Id. § 3.2.1. Samsung then has thirty days to pay the amount due under the invoice, with late payments carrying an interest rate of 5%. Id. §§ 3.2.2-3.2.3.

Like the PLA, the BCA provides for resolution of certain types of disputes through a good faith discussion process followed by binding arbitration under the ICC Rules. The BCA's arbitration provision applies to "any dispute between the parties with respect to any Royalty and Credit Calculation Report, the calculation of any Reinvestment Credits under Section 3.1.4, the calculation of any Success Credit Recapture, the calculation of any WP Termination Credits, the scope or results of any audit under Section 3.1.5 or any Annual Invoice." Id. § 3.3.1-3.3.2. In addition, the BCA provides that the parties consent to jurisdiction and venue in the Southern District of New York, or, alternatively, in New York state

court in Manhattan, "[w]ith respect to all civil actions or other
legal or equitable proceedings directly arising between the parties
or any of their Subsidiaries under this Agreement (other than those
covered under Section 3.3)." Id. § 9.5.

Finally, the BCA prohibits assignment of the agreement or any
rights or obligations thereunder. Id. § 9.7. Where the assignment is
to a competitor of the other party, "assignment" is defined to
include "a merger of a party with a third party, whether or not the
party to this Agreement is the surviving entity." Id. If one party
effects a prohibited assignment, then the other party has the right
to terminate the agreement immediately upon written notice. Id.
Furthermore, if Samsung terminates the BCA for a breach of the anti-
assignment clause, then it also has the right to terminate the PLA
by providing Microsoft with written notice as part of, or
concurrently with, its notice terminating the BCA. Id. § 8.5.

The present dispute arises from Microsoft's acquisition of
certain business units of Nokia Corporation, a Samsung competitor.
According to the Amended Complaint, Samsung made the royalty payment
for Fiscal Year 1 as required. Amended Compl. ¶ 10. For Fiscal Year
2, Samsung submitted its Royalty and Credit Calculation Report on
August 29, 2013, reporting that it owed over $1 billion in
royalties. Id. Microsoft did not dispute the report. Id. On
September 3, 2013, however, Microsoft announced its intention to
acquire Nokia's Devices & Services business (the "Nokia
Acquisition"). Id. ¶ 11. After that announcement, Samsung claimed

that the planned acquisition would breach the PLA and BCA in various ways, including by breaching the anti-assignment clause, and refused to make the Fiscal Year 2 royalty payment, which was due on October 11, 2013. Id. ¶ 12. Samsung eventually made the royalty payment on November 29, 2013, with a reservation of its rights and legal positions, but refused to pay interest for the period of delinquency, which Microsoft claims amounts to almost $7 million. Id. ¶ 13.

Microsoft commenced this suit on August 1, 2014, asserting two causes of action. First, it claims that Samsung is liable for breach of contract for failing to pay the nearly $7 million in interest owed for its late payment of the Fiscal Year 2 royalties. Id. ¶¶ 52-58. Second, it requests declaratory judgment that (1) the entities acquired in the Nokia Acquisition are covered by the patent licenses granted under the PLA, (2) the Nokia Acquisition does not give Samsung any basis to assert patent infringement claims against Microsoft, (3) the Nokia Acquisition does not violate the anti-assignment provisions of the PLA or the BCA, (4) the Nokia Acquisition does not give Samsung the right to terminate or modify the PLA, (5) the PLA remains in effect following the Nokia Acquisition and Samsung remains obligated to make all royalty payments due thereunder, and (6) the PLA is governed first by the federal laws of the United States to the extent federal subject matter exists, and second by the laws of the state of New York. Id. ¶¶ 59-62. Samsung moves to compel arbitration of all of Microsoft's

6

claims pursuant to Section 3.3 of the BCA and to stay the case pending the conclusion of the arbitration.

Ultimately, whether Samsung can force Microsoft to arbitrate depends on whether their dispute comes within the scope of the arbitration agreements, i.e., whether it is arbitrable. Before the Court can reach this question, however, it must resolve the antecedent question, namely, who decides whether the dispute is arbitrable, the Court or the arbitrators. As arbitration is a creature of contract, the answer depends on what the parties agreed. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). As with any other issue, a party can be forced to arbitrate the issue of arbitrability only if it has specifically agreed to do so. Id. at 945. Accordingly, questions of arbitrability are ordinarily for judicial determination, unless there is "clear and unmistakable evidence" that the parties intended to submit them to the arbitrators. PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198-99 (2d Cir. 1996). If the contract is silent with respect to arbitration of arbitrability, or if it is ambiguous, then the Court must decide the issue itself. See First Options, 514 U.S. at 945.

When construing arbitration clauses, courts distinguish between broad and narrow clauses. See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001). A broad arbitration clause is one that "purport[s] to refer all disputes arising out of a contract to arbitration." McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988). A

narrow arbitration clause, by contrast, is one that "limit[s] arbitration to specific types of disputes." Id. The provisions at issue here are clearly of the latter type, as they provide for arbitration of specific disputes related to reporting, accounting, and auditing.

In cases involving broad arbitration clauses, courts have held that the parties' adoption of the ICC Rules constitutes "clear and unmistakable evidence" of their intent to arbitrate arbitrability. See, e.g. VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P., 717 F.3d 322, 326 (2d Cir. 2013). This is because the ICC Rules provide that, if a party raises any objections "concerning the existence, validity or scope of the arbitration agreement … any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself." Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 122 (2d Cir. 2003).[1] In such cases, courts infer that, by agreeing to arbitrate under the ICC Rules, the parties intentionally incorporated the specific rule submitting questions of arbitrability to the arbitrators.

Where, however, the arbitration clause is a narrow one, this inference does not hold. For example, the Second Circuit recently

---

[1] The version of the ICC Rules currently in force has a substantially similar provision. See International Chamber of Commerce, Arbitration Rule 6(3) (2012), available at http://www.iccwbo.org/products-and-services/arbitration-and-adr/arbitration/icc-rules-of-arbitration/.

considered the effect of a clause providing for arbitration under the American Arbitration Association ("AAA") Rules, which, like the ICC Rules, empower the arbitrators to rule on their own jurisdiction. See NASDAQ OMX Grp., Inc. v. UBS Secs., LLC, No. 13-2657-CV, 2014 WL 5486457, at *19 (2d Cir. Oct. 31, 2014). The clause at issue directed that: "Except as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and other matters in question between the Parties to this Agreement … shall be settled by final and binding arbitration." Id. at *18. The court held that, because certain issues were expressly made not arbitrable, the AAA Rules would not apply "until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." Id. at *19. In other words, unlike agreements committing all disputes between the parties to arbitration under the AAA Rules, an agreement to arbitrate only certain issues under those rules would not "signal the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration." Id. In reaching this conclusion, the court relied on a previous case involving a broad arbitration clause that contained a carve-out for one particular type of dispute. See Katz v. Feinberg, 290 F.3d 95, 96 (2d Cir. 2002). In that case, the court held that "the presence of both these clauses creates an ambiguity, which … requires us to assign questions of arbitrability to the

district court, not the arbitrator." Id. at 97 (citing First
Options, 514 U.S. at 944).[2]

This reasoning applies with even greater force here. Whereas
the agreements at issue in NASDAQ and Katz provided for arbitration
of all disputes except for certain narrow exceptions, the PLA and
the BCA commit only specific categories of disputes to ICC
arbitration, reserving all other disputes arising under the
agreements for judicial resolution. PLA § 4.2.5; BCA § 3.3.2. Given
this, the Court cannot infer from the parties' reference to the ICC
Rules alone that they intended to arbitrate questions of
arbitrability. The more plausible reading of the parties' agreement
is that they intended the ICC Rules to apply only to those disputes
that they expressly agreed to arbitrate. See NASDAQ, 2014 WL
5486457, at *19. To hold otherwise would allow a party to force
arbitration under any contract containing an ICC arbitration
provision, no matter how narrow the arbitrable subject matter or how
unrelated the actual dispute to that subject matter (thereby
imposing on its opponent the expense and delay of forming an
arbitral panel only to convince the panel that the dispute was not
arbitrable). Absent "clear and unmistakable evidence," the Court
cannot conclude that the parties intended this result.

---

[2] Similarly, New York law is clear that, where the parties' agreement
contains a "narrow arbitration provision, the reference to the AAA
rules does not constitute clear and unmistakable evidence that they
intended to have an arbitrator decide arbitrability." Zachariou v.
Manios, 891 N.Y.S.2d 54, 55 (1st Dep't 2009).

Accordingly, the Court now considers the question of arbitrability itself, i.e., whether the present dispute is within the scope of the parties' agreement to arbitrate. The Federal Arbitration Act ("FAA") creates a presumption in favor of arbitration, such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000). Nonetheless, where, as here, the arbitration clause is a narrow one, the court "must be careful to carry out the specific and limited intent of the parties." McDonnell, 858 F.2d at 832. The court must order arbitration only if the question at issue is "'on its face within the purview of the clause.'" Id. (citation omitted).

Samsung argues that both causes of action in the Amended Complaint are arbitrable under the BCA because they are "dispute[s] between the parties with respect to any Royalty and Credit Calculation Report … or any Annual Invoice." BCA § 3.3.1. Microsoft's first claim, for breach of contract, seeks interest for late payment of royalties that were due under the 2013 Annual Invoice. Its second claim, the argument goes, seeks a declaration that the Nokia Acquisition did not relieve Samsung of its obligation to submit future Royalty and Credit Calculation Reports and to pay future Annual Invoices. Thus, Samsung argues that Microsoft's claims

relate to past and future Royalty and Credit Calculation Reports and Annual Invoices.

This argument stretches Section 3.1.1 too far. The present dispute is not about the Royalty and Credit Calculation Reports and Annual Invoices themselves, as the information and calculations reflected therein are undisputed. See Amended Compl. ¶¶ 45-51. The dispute relates to those documents only in the sense that it affects Samsung's continuing obligation to make payments thereunder. Under that interpretation, any allegation of material breach would be arbitrable, as a claim for termination or rescission of the agreements would necessarily affect future Royalty and Credit Calculation Reports and Annual Invoices.

The real controversy in this case concerns the interpretation of substantive provisions of both agreements, not the discrete accounting and invoicing issues that the parties have agreed to arbitrate. The crux of the dispute is whether the Nokia Acquisition was, as Microsoft claims, an addition of a new subsidiary or business unit as contemplated by Section 3.2 of the PLA, or whether it was, as Samsung contends, a "merger" with a competitor prohibited by Section 9.7 of the BCA. Id. Microsoft's claims turn on interpretation of these provisions, the resulting effect on the rights and obligations of the parties, and any corollary questions of contract interpretation that may arise. These central issues are plainly not disputes about Royalty and Credit Calculation Reports or Annual Invoices. Because the dispute is not "on its face within the

12

purview of the clause," <u>McDonnell</u>, 858 F.2d at 832, the Court finds that it is not arbitrable.

For the foregoing reasons, the Court denied Samsung's motion to compel arbitration and stay the case.

Dated:   New York, NY
         November 20, 2014

JED S. RAKOFF, U.S.D.J.